May it please the Court, Ken St. Pei on behalf of Angie LaFleur regarding the wrongful death of her husband, J.J. LaFleur. Two competent longshoremen working side by side, walking along a platform, when one of the men saw the hole to his death, neither of the men saw the hole before he fell through it. The question before this Court is, is the longshoreman's duty to find a hole that may or may not be there, and may or may not be marked, greater than the duty of the vessel owner, who made the hole in the first place, knew the hole was there, and knew it presented a hazard. I would submit to you that holes in and of themselves are inherently dangerous. This is recognized by the fact that OSHA, our Congress, has enacted laws requiring that they be marked or covered. Now, OSHA doesn't apply to this case, but that's important to note because holes are not easily seen. A little background on this case, Mr. LaFleur, J.J., worked for Shore. They were a scrapyard, kind of had a funny relationship where he was a jack-of-all-trades for the owner. He was involved in an automobile accident not related to this. A few years before the accident, he was put back to work and they gave him this title of independent contractor. At the deposition of Mr. Catton, his boss, it was clear he had been persuaded by his boss. It came out later in his testimony that Mr. LaFleur was not an inspector. The inspector for this type of project would have been the rig foreman. That was Mr. Smith, who was walking next door to Mr. LaFleur at the time of the fall. That's important because of the syndia duties and the arguments that Mr. LaFleur should have been out there looking for these holes while he was up there on the rig. After Mr. LaFleur goes back to work, he is doing odd jobs around the scrapyard. Mr. Smith, who is the rigging foreman, goes up to this rig when it's first pulled into the yard and he encounters an oil problem. In fact, he had been warned by Manson that there might be an oil problem up there. He calls over the radio and Mr. LaFleur, just in response to hearing this on the radio, goes up and sees if he can help out. Both men's attention is directed to the oil issue, which is potentially very hazardous to the scrapping crew, to the welders and the cutters who are going to be up there. That's the focus of their attention, and rightfully so. As they're walking along this platform, there are these holes that have been cut in the floor of the platform to allow for the rigging to be chained to the four pilings that held up this particular platform. If I didn't say so before, and if the course is not familiar, this is a platform sitting on top of a barge. So they're up there. Their attention is addressed to the oil issue. There's a pipe, which they testify is about seven feet above J.J.'s six-foot frame. There's a skid that they're walking around, and there's this hole, which all the testimony indicates is about as big as two legal pages put together, maybe slightly larger than that. Mr. Catton's testimony was that he still can't understand how a man fit through that hole. So as they're walking along, J.J. is directing his attention to this pipe, which not only is something directly in his line of sight and above his head, but has the potential oil issue in it, and he steps through this hole and he falls. The testimony from Smith is that he never saw the hole before, and that the hole could not be seen from four feet, five feet, or eight feet away. And Smith volunteered on my examination, it looks like solid floor. So later there's some testimony that Smith, in hindsight, says, well, you could see it when you were on top of it, and I wouldn't have stepped in it because I would have watched where I put my feet. Well, that is what the trial court seized upon, that testimony. Not the testimony that they didn't expect holes to be up there, that if there were going to be holes up there, they would be marked or covered. Not that they were focused on the oil issue. Not that you couldn't see the hole from four, six, or eight feet away. Not that it looked like solid floor. Not that it was only the size of two legal pages put together. But the fact that Smith says, I wouldn't have stepped in it because I would have watched where I put my feet, which of course is purely speculative. It's pure speculation. While it might have some value to the court later in trial as to what was going on up there. What do you have to prove against Mason, against the owner? We have to prove that they created this hole, which they did, that the hole was a dangerous condition. And there's no legal fault in doing that? No, sir. It was created for a purpose. It was a hazardous condition, which we argue it was. And that they failed to warn Mars and Mr. LeFleur about its presence. Failure to warn. Yes, sir. That's what you have to prove, failure to warn. Yes. We think it's a quasi-hybrid between active control, because there's a lot of issues about active control. And the trial court kind of gave that short shift. But we don't know who had control of this rig. Was it Manson? Was it Mars? Hadn't they signed over control? No. There's a contract that allows for the rig to be transported there, and then for them to begin cutting it up, and there's some terms of payment. But there's no official sign over control. And the way it gets fuzzy is the fact that Manson is out there to begin with. They have their inspector. Their inspector inserts himself into the process of scrapping by telling them, hey, you got this oil issue up there. So these men go up there to address that very potentially dangerous situation, but Manson doesn't tell them the simplest thing around is, hey, we cut holes and we didn't mark them, which we know is commonly done. Do you get to go back to the district court if there's a fact issue on open and obvious, or do you have to show something more than that to go back to the district court? I think if this court finds that it was not open and obvious, then we should be able to go back to the district court. Well, it finds a fact issue on open and obvious, then you automatically get to go back to the district court. There's not some other backup theory they have that would prevent you. I guess I'll ask them. Well, no. Yes, Your Honor. They are arguing that under the Cyndia line of cases, and particularly in this court, just because it is, even if it was open and obvious, if he had, if Mr. LaFleur had the obligation to find this hole. But he wasn't the inspector for that. He was inspecting for something else. There's at least a fact issue on that, too. Exactly. That's their second argument. So, you've got to show that there's a fact issue on open and obvious, and you've got to show there's a fact issue of whether his duty was to inspect for these holes. Those are the two things that you need. Correct. And you think you have them. I'm not sure. Open and obvious, the nature of it is the question, but the question is, was there a duty to warn? Now, the nature of it, or the way it sat there, and whether it was obvious, that bore on him. But that's part of the evidence. You don't have to have a finding one way or the other. But was it such that it was a duty to warn that it was there? I think even Manson would agree that there's a duty to warn if it is not open and obvious. I think their counsel is going to stand up here and say, this was open and obvious, and therefore, we did not have to warn about it. If it wasn't open and obvious, then yeah, we had to warn about it, because it's an obvious, dangerous, hazardous condition. I think everyone would agree a hole in a platform 60 feet in the air is a dangerous condition. And the testimony, even from their own witnesses, has established that we mark these holes for our people, but when we turn the rig over to somebody else, we don't necessarily care so much. And that's, despite how harsh SINIA may be in a lot of cases, that cannot be proper. It cannot be proper to have a vessel owner delegate a very obvious duty, a very simple duty, to put some plastic tape or run a cord through it or at least tell somebody, hey, we cut these holes up there and we didn't mark them. Now, the situation where that vessel was and what they were there to do with it, that's all related to this question I asked you about warning. I wonder if you'd expect or impose a duty to warn to a wreck that's going to have a lot of hazards and dangers, and the poor man that fell would know that. So do you have to warn everybody under any circumstances? Your Honor, I think you're discussing an issue like was addressed by the United States Supreme Court in West, where you had this ship that was in terrible shape and you had a company that was hired to go out there and fix it up. And they'd had all kind of things wrong with it and all kind of dangerous conditions going on. And the thing that the plaintiff in that case was actually working on was something that they had directed them to fix. And because of the defect, he was injured. No, I don't think you have a duty to warn in those situations. But that's not what we have here. Morris, Mr. Lefleur's contractor, is going to be cutting up this rig. The rig is in bad shape. That's why it's being decommissioned. That's understandable. There are going to be sharp edges on it and staircases that might be missing a rung or two, or a handrail down on one side. Those are things that you might expect and be prepared for. But they have to be able to do their job safely. And they have to, if something like this is hidden from them, then they have to be warned about it. And I think that's what we have here. Is your argument that it's hidden because of the way that it's set up? It looks like it's the floor? Or is it hidden, actually hidden in some way? We never got a direct answer on that from the witnesses about whether it was hidden behind a skid or not. But Mr. Smith's testimony was it looked like solid floor. So it's some sort of optical illusion or something, the way it's placed in the grand scheme of things. Correct. And I don't know if your Honor has ever walked on a platform before, but it does play tricks on your eyes. It's very difficult to see where there's floor and where there's not floor. And I wanted to mention before I run out of time that a standard that would require the plaintiff, who is competent by all measures, and Mr. Smith, who's competent by all measures, to watch everywhere they put their foot while they're working is simply not practical. That is not what CINIA requires them to do. It has to be reasonable. That is not reasonable. Men working on a rig whose attention are going to be drawn to other things, they're not going to watch every step they take. And by Mr. Smith's testimony, it was only one or two steps that Mr. LaFleur took while looking up before he fell through this hole. I'll save the rest of my remarks. Thank you. Thank you, Counsel. Your Honors, I'm Mike Baggett from the law firm of Wagner, Baggett & Rare in New Orleans, representing the Atlalee Manson Gulf. Would you have preferred walking down the street, or is coming to Houston all right? Actually, I walked down the street from my hotel, and it was very pleasant and not nearly as muggy as home. But I will say I was a little surprised that this Eastern District of Louisiana appeal ended up here in Houston. Just lucky. I was involved in another case where they sent another EDLA case to Lubbock, so I'm delighted to be here. We've had cases in El Paso, so consider yourself lucky. So let me just make a few comments to start out. As Judge Reveley indicated, this is not a working platform. This is a wreck, and not only that, it's a part of a wreck. This is a half of a platform that was known as an A23A platform. It was purchased by Manson from an oil company. Then the arrangement was it was sold to Mars. Mars was going to scrap it and cut it up and sell the scrap pieces. The other thing that seems to be odd here is that the appellant's counsel seems to suggest that these two individuals, Mr. Smith and Mr. LaFleur, were babes in the woods. They are not. Mr. LaFleur himself, as the record will indicate, had at least 20 years of experience in this very type of work. I didn't hear him say anything about babes in the woods. I thought he said they were reasonably competent at their job. Well, but he's saying that we, the way I'm reading his argument, he seems to suggest that it was negligent on our part to go on and have a hole in this platform and that we should have protected these men from this hole, even though Cyndia, Howlett, Kirksky, and the other cases that are applicable to this type of worker says that the primary obligation to protect them lies in themselves and their employer in the case of Mars or Mr. LaFleur himself as an independent contractor. Does the record reflect whether your client knew of the holes? Oh, it's undisputed that our client knew of the hole. But it's also undisputed, Your Honor, and I have to correct counsel on this, that Mars was aware that sections of platforms like this, not all the time, but from time to time would have holes in them and that they knew that they had to look for those holes and inspect for them. Even if they got a statement from whoever delivered the platform to them that there were or were not holes, the testimony by Mars personnel was we couldn't rely on that and we had to inspect it ourselves. But this wasn't the inspection for that. This was an inspection for something else. I'm sorry, Your Honor. Was it an inspection for oil? Well, we want you to be excited. I am excited. Was it an inspection for oil? Is there a fact issue on that? Well, I don't think so. Because what happened was is that you had the initial report was made by Mr. Clement, I think is the way they would pronounce it in Louisiana, Clement, was on behalf of Mars. He made sure that the barge had arrived with the section of the platform on board, that the cargo manifest was correct, and that none of Manson's equipment was left on board. He left. He was no longer there. But before he left, he did tell them that there may be an oil problem. Now, Mr. Smith, who is the supervisor for Mars, went up there and he has to conduct an investigation or an inspection, I should say, to make sure, well, first he's going up for the oil, but he also has to conduct a pre-work investigation. The testimony isn't necessarily, well, the clear testimony is that apparently Mr. LaFleur heard that there was an oil problem on board, and so he goes on to the platform, and presumably to help Mr. Smith with this oil problem. Interestingly, Mr. LaFleur goes up a different way from Mr. Smith. He goes up a walkway that comes, the barge is made up to a dock. The walkway comes up from the dock side and goes up to a raised platform, we believe 40 to 50 feet above the barge deck. As you go up in the platform, and there are photographs in the Record on Appeal, you can see holes cut in the grating of that deck. You can see that from the dock. You can see it when you climb up the stairs that Mr. LaFleur would go in. Now, counsel has claimed that the two men did not observe the hole in the deck. The testimony is that Mr. Smith was approximately eight feet behind Mr. LaFleur, who is a big man, and they were walking around a piece of equipment. Mr. LaFleur was in front of him. So he did not see when Mr. LaFleur took the turn. Counsel, we're not recording when you get away from the microphone. I'm sorry, Your Honor. Let us visualize it in some other way. Okay. He didn't see the hole because Mr. LaFleur was between him and the hole. So he didn't see the hole before Mr. LaFleur fell through it. But the fact of the matter is, is that he said that, I did see it as soon as he fell through it a distance of eight feet away. But did he also say that it looked like the floor at another point? Well, at another point he did. He's got some different kind of testimony going on. He did say that at another point, and then Mr. St. Pei had him on direct at first, and then I had him on cross. And during my questioning, I actually presented him with the photographs that are part of the record on appeal. And I asked him specifically, does this show the condition of the barge or the barge section, excuse me, platform section at the time? And he says it did. And I said, could you see it from eight feet away? Yes. And then he said, and this is very important, on questioning by, I believe, Mr. St. Pei, would you have fallen through the hole yourself? And this is something that the district court latched on, Judge Barbier. Mr. Smith said, no, I would not have gone through the hole because I watch where I put my feet. Now, the standard in this type of case set out in Howlett from the U.S. Supreme Court is that we must turn the barge over to a company such as Mars or Mr. LaFleur in such a condition that an expert and experienced stevedore, mindful of the dangers he should reasonably expect to encounter, will by the exercise of reasonable care be able to conduct his operations in reasonable safety. And I want to suggest to you a comparison. On the one side we have Mr. Smith, and on the other side we have Mr. LaFleur. Mr. LaFleur, the testimony by Mr. Smith was Mr. LaFleur was observing the pipe, which was some distance above the deck. I'm going to suggest to you perhaps eight feet above the deck. He was looking at the deck as he's walking around it, and Mr. Smith says, I watch where I put my feet. I suggest to you that the expert and experienced stevedore would act in exactly and precisely the way that Mr. Smith acted, not in the way that Mr. LaFleur acted, and that while it is unfortunate that Mr. LaFleur took that step and fell and died as a result of that, what the law tells us is that if this is an open and obvious condition, as we contend that it is, there is no liability on the part of the vessel. Counsel, address the dispute over what the deceased's role was out there. There's a pushback in calling him an inspector, and he wasn't inspecting for structural stability. He was trying to help out on an oral. How does that fit into the standards that we're talking about? Your Honor, I pushed and I pushed and I pushed in my motion for summary judgment and in my statement of uncontested material facts to get Mr. St. Pei to admit what I believe to be the fact, meaning that Mr. LaFleur was actually inspecting at the time, but I could not get him to do, to admit much except on one of my questions. Bear with me a minute as I look for the exact language. In one question, he admitted, and I'm quoting from page 11 of my brief, and this was the, we did the statement of uncontested material facts and the plaintiff had to respond and responded, admitted to this request. If he noticed a hazard such as a hole, LaFleur was to report it to MARS so that steps could be taken to make the area safe and or minimize any risk before MARS personnel were dispatched to cut the structure up for scrap. Now, he admitted that. He may not admit that his title was inspector and holds to the fact that he was an independent contractor, but I think if the court looks at this admission, it indicates he was to look for holes, and in fact, I want to direct the court's attention to the testimony of Mr. Smith, who was the co-worker, and this is quoted at page 10 of my brief at footnote 35. He says, Smith knew and expected LaFleur to know that there would be holes in the grating or at least to inspect for them. And then it goes on, and this is footnote 36, Smith also said that it was very rare in the industry for someone to advise MARS about holes in the grating. That's why we go up and look for it and we look ourselves. You have emphasized that so much. I'm trying to see where in the case law, if he were not an inspector, or if we say there's a fact question there, how your obligation to warn of hazards would change. He was on there on this property in some capacity that let's say is uncertain what his duties were, and I accept from your viewpoint it's not uncertain. Let's just say there's a fact question. Is your obligation to him under the law that we're talking about different if he's not inspecting? Well, I have two arguments on appeal, Your Honor, as you know. The second one is based on the West versus U.S. breach of an independent employment obligation, and so if he is not an inspector and had no duty to inspect and point out hazards, then I'd probably lose that argument even though it was not contested by the plaintiff on appeal. But the question of open and obvious is a question that cuts through whether he's an inspector or not, because he is still proceeding under a Cyndia claim against my client, and the Cyndia claim extends to him just as it would to Mars. So whether you name him an inspector or an independent contractor or something else, the fact that it's an open and obvious condition would allow this court to grant that. And, you know, really the question, and I want to raise this issue. I think I've raised it in the brief, but the point I want to make to the court is that whether, oh, I interrupted myself with another thought before I lose this one. Let me mention this. It is not clear from the record whether Mr. LaFleur saw the hole or not, because Mr. Smith testified that he wasn't sure if he saw the hole or not, but it appeared to him that he took a step and misstepped or whatever, but he went through the hole. Now, so, you know, in his brief, the appellant's counsel makes this big argument, no one saw the hole, no one saw the hole, no one saw the hole. Well, we know from Mr. Smith's testimony he did see the hole, although admittedly post-accident, and Smith also testifies he's not sure if the man saw the hole or not. Okay. But Smith also testifies that you cannot see it until you are on top of it. It looks like solid floor. He has multiple, yes, you got him on cross, but he's his other testimony, and we have to take, he can create a fact issue on his own testimony. He can be so all over the map. I understand that, Your Honor, and the only thing I can tell you is that the district court looked at the hole record and considered all the evidence that was before it. Keep in mind, this is a limitation of liability action. It's only going to be tried to Judge Barbier. And so he looked at all the evidence in the case and the entire record, and he did that, and he drew the inferences he is allowed to draw. And I might also add having Judge Barbier to grant a defendant's motion for summary judgment is not very, it doesn't happen very often, but I think he, not only because of his ruling in this case, but in other cases, I think he's a fine judge, and he reviewed the entire record. The questions were raised. So you're pointing, I'm sorry, go ahead. The questions were raised during oral argument on the motion for summary judgment. Do you have anything else to give me other than what you've presented today? This was being asked of Mr. St. Pei. And Judge Barbier said, excuse me, and Mr. St. Pei said, I have nothing else to add, Your Honor. Or do you think that there's going to be different evidence adduced from any of these witnesses when this matter is tried? And he said no. So the court, the trial court, who would be the trier of fact and the decider of fact, looked at the entire record and made the call. And what's the case that says we don't use the normal summary judgment standard in that case? I want you, Your Honor, what I've done is I've cited at pages 13 to 15 of my brief the full exposition of the cases. And there's a case cited at page 15. I might read to you just one to two sentences. If a decision is to be reached by the court and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it that there are no genuine issues of material fact, even though the decision may depend on inferences to be drawn from what has been incontroverbably proved. Well, the problem with that is the first clause of that, where you said there's no issues of credibility. If the one witness is testifying three different ways, then there are issues of credibility as to whether he's saying the right thing at the beginning of his deposition or he's saying the right thing on his cross. The only way you have to put together his credibility in order to decide that. It's not that they're all consistent. Well, he's looking, keep in mind, Your Honor, he's looking not only at the testimony of the witnesses but at the photographic evidence, and he's bringing all that into play. Right. But it doesn't say you can ignore other evidence. It has to all be consistent in order for you to do it. It doesn't really overturn the normal summary judgment standard. Well, I think the problem in this case, if I can just conclude this statement from this quote, it says, when the judge, as trier of fact, is in such a position as he thought he was, he ought to draw his inferences without resort to the expense of trial. So I guess, Your Honor, my thought is I think the court, Judge Barbier, was correct in his ruling. I think the overwhelming evidence in the record supports the summary judgment that he granted, and I do believe that if the case is remanded, we're going to be back here in another year, but with the same result, although perhaps different facts. Not different facts, but on a different evidentiary. Standard. Different review standard. Yeah. But I think the court got it right. I think it was appropriate under the law, and I would ask that it be affirmed. I've got three questions. Oh, I'm sorry. Your client cut the hole? Is that undisputed? We didn't cut the hole, but we arranged for a third party to cut it. Okay. And your client didn't cover the hole because it wasn't their practice to do so? Is that correct? No. There were three reasons why they didn't. This happened offshore, and, okay, what happened is that they're lifting pad eyes on the deck that were deeply corroded. You have pictures of those in the record. Those couldn't be used. They had to cut the holes adjacent to the legs to bring the lines down from the crane under the deck, around the leg, and back up and secure it to the crane sling. And they were not going to have any other people up there. They did not know precisely how the group they sold it to was going to cut it up, and those people normally would take care of their own employees. I do admit, though, Your Honor, that there is testimony that when a customer specifically requests a customer of Manson that holes be covered, that they will do that. There is testimony to that. Okay. And there's also testimony that it's the industry practice to cover the holes even without a request by the other party, by MARS? No. There's not testimony of that? I don't recall that. I thought there was somebody who said normally they cover the holes, and they're usually covered. Well, I don't recall that, but I do recall the testimony that MARS knew that they would receive platforms from time to time that would not have covered holes, and they had to look for them. Okay, so this is not a hole that's caused by a wreck or some kind of destruction. No. This is a cut hole. Right. Okay. Thank you, Your Honors. Thank you. Thank you. Your Honor, picking up with that last question regarding the holes, Jeff Smith testified that holes for rigging are usually covered or marked. And that was at, I'm sorry, I don't have the record, but that's at page 38 and 39 of his deposition. But a good stevedore knows that there could be holes that aren't covered. But he knows that there could be holes on a platform, but when asked specifically about these rigging holes, in other words, these platforms might have holes in them for many different reasons. And this particular platform had, for example, conduits running up to vessels. And those holes had, oddly enough, been marked by Manson, because they had to be, because while their people were up there, they had to mark up those holes. What they didn't mark was the holes that they cut. And what Jeff Smith was testifying to was that, in his experience, holes that are cut for this rigging procedure are usually either covered back up or they're marked. And he says that at two or three different places in his deposition testimony. And Mr. Catton said it would be great if everyone would mark and cover their holes, although they acknowledge that sometimes they're not. Well, counsel, what we're looking at is a standard in which people working on a vessel that's in disrepair and is going to be demolished need to be careful. And what you're talking about is how, at times, certain warning measures are used, but we still come back, it seems to me, to the ultimate standard of, if it's open and obvious, to someone exercising reasonable care considering the circumstances, which is a derelict vessel structure, then you're not going to have a liability. I'm not saying how that fits to these facts, but it seems to me you're talking about sometimes they're covered, sometimes they're not. It seems to me sometimes what is required is not the limit of what people are willing to do, but we need to figure out what is the legal obligation here. And so why is there a legal obligation to mark, well, not mark a hole, to warn in some way of a hole in a structure that's being torn apart? Because there is a duty, there's an obligation to warn or mark all holes. I think that's what the law is. You're saying this isn't open and obvious. Are you saying that they're liable because all holes weren't marked or because this hole wasn't open and obvious? This particular hole, which is only two legal pages. Okay, so it's not open and obvious is what you're saying. It's not open and obvious. So they don't have a duty to mark all holes under the standard we're talking about under CINDIA, but they do have an obligation to notify of hazards that are not open and obvious. Correct. Okay. I wanted to address next to your issue the question you had about whether he was an inspector or not. Well, why it would make a difference was really my question. I mean, you've gone through the facts. You don't have to go through that again. But why, if he's an inspector, is he subject to one standard? And if he's not an inspector, he perhaps has more protection. Well, I think what Manson is trying to argue is that if he's up there and he is tasked with the obligation of actually looking for holes, then somehow they shouldn't be liable because that's his job and that's the CINDIA test. But I would argue that that's not true. If you have a hole that's not open and obvious, even if the person is tasked with looking for it, they still have a duty to mark something that's not open and obvious. And it's kind of silly, but the example is if you took a needle and threw it out on this floor and said, Mr. Sempe, go pick up that needle, and I can't see it until I'm actually standing on top of it and it's driving through the bottom of my foot, then that needle is not open and obvious, even though I know it's there and you sent me to go look for it and find it. I did want to point out some deposition testimony, which is not quoted in my brief, but which I ran across while rereading the deposition, and it came in the context of Mr. Baggett asking Jeff Smith about whether J.J. should have known there were holes up there in his experience. And Mr. Baggett asked, but you knew J.J. knew because of his experience offshore. And Smith answered, J.J. had experience offshore, but J.J. had experience in a different aspect of the field offshore. We were getting into decommissioning and demobilizing and tearing apart. It's totally different from, and Mr. Baggett cut him off. And that was key because Smith was getting into an area where he hadn't been prepared and Mr. Catton had been prepared. And I explained to the court at the hearing that they needed to listen to these witnesses. Mr. Catton was not truthful. When he said something, you knew it was a lie. And Mr. Smith was trying to be truthful, but he was also trying to walk the plank or toe the line that his lawyers had asked him to toe. And that's something that you only get from live testimony. Thank you.